**NELSON & FRAENKEL LLP**
Stuart R. Fraenkel (173991)
Gabriel S. Barenfeld (224146)
707 Wilshire Blvd., Suite 3600
Los Angeles, CA  90017
Telephone:  (213) 622-6469
Fax:  (213) 622-6019
stuart@nflawfirm.com
gbarenfeld@nflawfirm.com

**KEHOE LAW FIRM P.C.**
John A. Kehoe (*pro hac vice to be filed*)
2 Penn Center, Suite 1020
Philadelphia, PA 19102
Telephone:  (215) 792-6676
Fax:  (212) 500-1329
jkehoe@kehoelawfirm.com

**PROFY PROMISLOFF & CIARLANTO, P.C.**
Joseph M. Profy
David M. Promisloff
Jeffrey J. Ciarlanto
100 N 22nd Street, Unit 105
Philadelphia, PA 19103
Telephone:  (215) 259-5156
Fax:  (215) 600-2642

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# SOUTHERN DIVISION

| | |
|---|---|
| STUART ZIMMELMAN, On Behalf of Himself and All Others Similarly Situated, | Case No.  15-cv-1694 |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| EXPERIAN HOLDINGS, INC., and EXPERIAN INFORMATION SOLUTIONS, INC., | |
| Defendants. | |

## **NATURE OF THE ACTION**

1.     Plaintiff Stuart Zimmelman ("Plaintiff" or "Zimmelman") brings this action as a class action on behalf of himself and on behalf of a nationwide class of all other individuals whose sensitive personal information was stolen from defendants Experian Holdings, Inc. and Experian Information Solutions Inc. (collectively "Experian" or "Defendants") in a cyber-attack.

2.     Experian compiles, stores, and monetizes for profit (which amounted to over $2 billion in 2013) vast amounts of sensitive personal and financial data. Such data includes, *inter alia*, names and addresses, social security numbers and credit files on approximately 220 million U.S. consumers. Experian also maintains information for 25 million active U.S. businesses, including T-Mobile US, Inc. ("T-Mobile"). Experian's consumer and business credit databases contain more than 1.5 petabytes (1.5 quadrillion bytes) of financial data and personal information, and it sends approximately 100 billion "permission-based" emails in the U.S. annually, containing financial data and information on hundreds of millions of U.S. consumers.

3.     On October 1, 2015, Experian announced that fifteen (15) million current or former T-Mobile customers were among the latest victims in a series of data breaches at Experian, including prior breaches that involved T-Mobile customer data. Now exposed to a vast underworld of credit and identity thieves operating in what is commonly called the "Darkweb," sensitive and private data extracted from Experian's servers originated from, *e.g.*, credit application forms filled out by T-Mobile customers, including Plaintiff.

4.     Plaintiff—and likely the vast majority of those affected by this breach—had no knowledge as to how their private information came into the hands of Experian nor could they have reasonably have avoided such data collection practices in the first place. Now, they are left to wonder why Experian maintained their personal and financial information for months, if not years, after signing up for their

T-Mobile account.

5.     Data apparently exposed in the Experian breach is now beginning to appear on the Darkweb.  Irish fraud prevention company Trustev, which monitors data sales listings on the Darkweb, has uncovered screen shots of listings that it believes originated from the Experian breach.  By way of example, Trustev provided the following screenshot:



6.     According to a Trustev spokesperson, "we saw listings go up for FULLZ data that matches the same types of information that just came out of the Experian hack."  FULLZ is a slang term used by hackers and data brokers to refer to a full package of an individual's personal identifying information.  Such grouping usually means the hacker has an individual's name, social security number, birth date, driver's license number, account numbers, and more.  Unlike a stolen credit card number that can be cancelled and reissued, the data Experian allowed to enter into the unscrupulous marketplace is used to obtain new credit cards, mortgages, and the stolen information may not be cancelled like a credit card.

7.     Class members are now exposed to a lifetime of identity fraud and the concomitant consequences as this information is exploited by others.

2

CLASS ACTION COMPLAINT

**JURISDICTION AND VENUE**

8.     This Court has federal question jurisdiction under 28 U.S.C. § 1331 because claims are brought under the federal Fair Credit Reporting Act, 15 U.S.C. §§ 1681e, et seq.  This Court has subject matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1332(a) (diversity) because the matter in controversy exceeds $75,000 in value, exclusive of interest and costs, and is between citizens of different States.  This Court also has jurisdiction under 28 U.S.C. § 1332(d) (Class Action Fairness Act) as this putative class action has more than 100 class members, more than $5 million in controversy, and the requisite diversity of citizenship.

9.     Venue is appropriate in this District because Experian Holdings, Inc. and Experian Information Solutions are each headquartered and their principal places of business are located within this District, and it is within this District where substantial acts occurred (namely, the data breach) giving rise to Plaintiff's claims.

10.     This Court has personal jurisdiction over Experian Holdings, Inc. and Experian Information Solutions by virtue of each having conducted (and continuing to conduct) substantial business within this District at all relevant times.

**THE PARTIES**

11.     Plaintiff Stuart Zimmelman ("Plaintiff" or "Zimmelman") is a citizen of Florida. Zimmelman applied for T-Mobile telephone service in or around April 2014. At that time, he was subjected to an Experian credit check.  Zimmelman would not have provided his Social Security number, identification, and other sensitive personal and financial information to T-Mobile, and would not have allowed T-Mobile to provide his information to Experian, had he been aware that Defendants lacked adequate data security safeguards.

12.     Defendant Experian Holdings, Inc. ("Experian Holdings") is a Delaware corporation and is a citizen of California.   Experian Holdings maintains its headquarters and principal place of business at 475 Anton Boulevard, Costa Mesa,

CLASS ACTION COMPLAINT

CA 92626.

13.    Defendant Experian Information Solutions, Inc. ("Experian Information") is an Ohio corporation and is a citizen of California.   Experian Information maintains its headquarters and principal place of business at 475 Anton Boulevard, Costa Mesa, CA 92626.

14.    Together, Experian Holdings, Inc. and Experian Information Solutions, Inc. are sometimes referred to as "Experian" or the "Defendants."

## FACTUAL ALLEGATIONS

15.    Experian is owned by non-party Experian plc, a global information services group headquartered in Dublin, Republic of Ireland and operating in forty (40) countries, including in Costa Mesa, California.   Experian plc is listed on the London Stock Exchange and is a constituent of the FTSE 100 Index.

16.    Experian North American sales topped $2 billion in 2013.  Its customers are companies, like T-Mobile, that buy limited access to its vast warehouse of credit information on consumers.  T-Mobile performs a credit check on applicants before granting them monthly-billed phone service, utilizing Experian, which sits atop more than 1.5 petabytes (1.5 quadrillion bytes) of data, and its information on approximately 220 million U.S. consumers and 25 million active U.S. businesses.

17.    Personally Identifiable Information ("PII") and/or Sensitive Personal Information ("SPI") are terms commonly used in U.S. privacy law and information security.  They are generally understood to be "any information about an individual maintained by an agency, including (1) information that can be used to distinguish or trace an individual's identity, such as name, Social Security number, date and place of birth …; and (2) any other information that is linked or linkable to an individual, such as … financial, and employment information."  Protecting PII and responding to a data breach are critical because the loss or unauthorized disclosure of sensitive information can lead to serious consequences, such as identity theft or other

4

fraudulent activity and can result in substantial harm.

18.     Examples of PII include, but are not limited to: (a) name, such as full name, maiden name, mother's maiden name; (b) personal identification number, such as social security number, passport number, driver's license number, taxpayer identification number; (c) financial accounts or credit card numbers; and (d) address information, such as street address or email address.  When opening his T-Mobile account in 2014, Mr. Zimmelman provided all four categories of PII.

19.     According to the U.S. Department of Commerce, "Breaches involving PII are hazardous to both individuals and organizations.  Individual harms may include identity theft, embarrassment, or blackmail.  Organizational harms may include a loss of public trust, legal liability, or remediation costs."[1]  Unlike theft of a credit card that leaves traceable transactions often insured by card issuers with numbers that can be cancelled and reissued on a moment's notice, PII or SPI is information that can be used on its own or with other information to identify an individual "in context" in order to exploit their information in any myriad of ways.

20.     Protecting PII and the overall privacy of information are concerns both for individuals whose personal information is at stake and for organizations, which may be liable or have their reputations damaged should PII be inappropriately accessed, used, or disclosed.  Therefore, treatment of PII is distinct from other types of data because it needs to be not only protected, but also collected, maintained, and disseminated in accordance with Federal and State law.

21.     According to the NIST PII Guide:

> The likelihood of harm caused by a breach involving PII is greatly reduced if an organization minimizes the amount of PII it uses, collects, and stores. For example, an organization should only request PII in a new form if the

---

[1] *See Guide to Protecting the Confidentiality of Personally Identifiable Information (PII)*, Recommendations of the National Institute of Standards and Technology ("NIST Guide"), http://csrc.nist.gov/publications/nistpubs/800-122/sp800-122.pdf (last visited on Oct. 11, 2015).

CLASS ACTION COMPLAINT

PII is absolutely necessary.  Also, an organization should regularly review its holdings of previously collected PII to determine whether the PII is still relevant and necessary for meeting the organization's business purpose and mission.

22.    On April 3, 2014, Zimmelman became a T-Mobile customer on a month-to-month plan.   Unbeknownst to him, T-Mobile had a pre-existing relationship with Experian to run a credit check on Zimmelman.

23.    On or around October 1, 2015, nearly 18 months after he signed up for T-Mobile services, Zimmelman learned that Experian and T-Mobile had seriously compromised the safety and integrity of his PII and/or SPI.   On that day, Experian issued a press release[2] which stated the following, in relevant part:

Experian North America today announced that one of its business units . . . experienced an unauthorized acquisition of information from a server that contained data on behalf of one of its clients, T-Mobile, USA, Inc. The data included some personally identifiable information for approximately 15 million consumers in the US, including those who applied for T-Mobile USA postpaid services or device financing from September 1, 2013 through September 16, 2015, based on Experian's investigation to date. . .

*       *       *

The data acquired included names, dates of birth, addresses, and Social Security numbers and/or an alternative form of ID like a drivers' license number, as well as additional information used in T-Mobile's own credit assessment. No payment card or banking information was acquired.

Experian is in the process of notifying consumers that may

---

[2] *See* http://www.prnewswire.com/news-releases/experian-notifies-consumers-in-the-us-who-may-have-been-affected-by-unauthorized-acquisition-of-a-clients-data-300152926.html (last visited Oct. 11, 2015).

CLASS ACTION COMPLAINT

be affected, and safeguarding their identity and personal information by offering two years of [free] credit monitoring and identity resolution services through ProtectMyID.

24. That same day, Experian posted an announcement on its website[3] which stated the following in relevant part:

- "Based on our investigation to date, some T-Mobile applicants who applied for services from Sept. 1, 2013 through Sept. 16, 2015 had unauthorized disclosure of their personal information."

- "The information that was exposed could lead to an increased risk of identity theft."

- "Be alert to 'phishing' by someone who acts like a colleague or friend and requests sensitive information over email, such as passwords, social security numbers, or bank account numbers."

- "Consider placing a fraud alert or security freeze on your credit.

- "Experian is handling notification about this unauthorized access given that the information was stored on a server in one of our business units.

- "In order to evaluate the risk level of a credit applicant, T-Mobile uses a variety of information to determine the likelihood that a borrower will be able to pay. Information used to do this can include a consumer's payment history, as well as information from Experian or other sources. That information is then compiled and used in their credit criteria when evaluating the risk level of an applicant."

25. Also on October 1, 2015, T-Mobile posted a letter from its Chief

---

[3] *See* http://www.experian.com/data-breach/t-mobilefacts.html (last visited Oct. 11, 2015).

7

Executive Officer ("CEO"), John Legere ("Legere"), on its website.[4]   The letter stated, in relevant part:

> We have been notified by Experian, a vendor that processes our credit applications, that they have experienced a data breach. The investigation is ongoing, but what we know right now is that the hacker acquired the records of approximately 15 million people, including new applicants requiring a credit check for service or device financing from September 1, 2013 through September 16, 2015. These records include information such as name, address and birthdate as well as encrypted fields with Social Security number and ID number (such as driver's license or passport number), and additional information used in T-Mobile's own credit assessment. Experian has determined that this encryption may have been compromised. We are working with Experian to take protective steps for all of these consumers as quickly as possible.
>
> Obviously I am incredibly angry about this data breach and we will institute a thorough review of our relationship with Experian, but right now my top concern and first focus is assisting any and all consumers affected. I take our customer and prospective customer privacy VERY seriously. This is no small issue for us. . . .
>
> *       *       *
>
> At T-Mobile, privacy and security is of utmost importance, so I will stay very close to this issue and I will do everything possible to continue to earn your trust every day.

26.   Also, on that day, T-Mobile posted an announcement on its website[5] stating, in relevant part, the following:

---

[4] *See* http://www.t-mobile.com/landing/experian-data-breach.html (last visited Oct. 11, 2015).

[5] *See* http://www.t-mobile.com/landing/experian-data-breach-faq.html (last visited Oct. 11, 2015).

8

CLASS ACTION COMPLAINT

- "Experian has taken full responsibility for the theft of data from its server."

- "Experian maintains a historical record of the applicant data used by T Mobile to make credit decisions. The data provides the record of the applicant's credit application with T-Mobile and is used to assist with credit decisions and respond to questions from applicants about the decision on their credit application. The data is required to be maintained for a minimum period of 25 months under credit laws."

- "All of our vendors are contractually obligated to abide by stringent privacy and security practices, and we regularly conduct reviews of vendor security practices as necessary."

- "Experian determined that, although Social Security and identification numbers were encrypted, the encryption may have been compromised."

- "Our vendors are contractually obligated to abide by stringent privacy and security practices, and we are extremely disappointed that hackers could access the Experian network."

27. According to Experian spokeswoman Susan Henson, the breach, which hit one of Experian's business units, not the consumer credit database, was discovered September 15, 2015. Experian failed to notify T-Mobile until September 21, 2015, and Defendants failed to notify affected customers until October 1, 2015. Neither Experian nor T-Mobile have offered to explain why it took two weeks to inform class members, including Plaintiff, that their sensitive financial and personal information was exposed to hackers and being sold on the Darkweb.

28. According to Avivah Litan, a security analyst at Gartner Research, whoever gained access to Experian's server will likely sell the consumer data on the Darkweb, adding that "people use this data to get to other people" to access more sensitive information, she said. As of October 7, 2015, Experian claimed, "there is

no evidence that the data has been used inappropriately," however such claim does not appear to be the case.   As Mark Sullivan, who writes about digital health for Venturebeat.com observed in an article titled *Data likely stolen from Experian/T-Mobile spotted for sale on Dark Web*, "T-Mobile data stolen from the servers of credit bureau Experian is already showing up for sale on the Dark Web, says one security firm. Irish fraud prevention startup Trustev, which monitors such data sales listings, sent VentureBeat screen shots of listings of data it believes originated from the Experian theft…"   Mr. Sullivan added, "This morning they saw listings go up for FULLZ data that matches the same types of information that just came out of the Experian hack," Trustev' spokesperson wrote in an email.

29.   Venturebeat provided the following screenshot:

/ / /
/ / /
/ / /

10

30.    In addition, Venturebeat provided to the following screenshot:

/ / /

/ / /

/ / /

11

CLASS ACTION COMPLAINT

31.   As data storage technology company Bat Blue Networks reported on October 5, 2015:

> Hackers who allegedly breached the credit bureau's servers and extracted confidential information belonging to 15 million people are now posting that data to the Darknet, according to security researchers.

> "This morning they saw listings go up for "FULLZ" data [packages] that matches the same types of information that just came out of the Experian hack," the researchers told reporters.  The data packages contain customers' names, social security numbers, account numbers, birth dates and other personal information.

> The data posted to the Darknet matches the content stolen from Experian servers, including information belonging to millions of individuals who applied for T-Mobile contracts in September of this year, according to reports.

32.   Underscoring the magnitude of the breach, on October 2, 2015, Attorneys General from states including Massachusetts, Illinois and Connecticut

announced they were investigating.[6]  Massachusetts Attorney General Maura Healey said she expects a multi-state probe will be launched into the breach at Experian. "We have contacted both companies to review the circumstances and anticipate working with attorneys general across the country on this matter," Healey said in a statement.   Illinois and Connecticut are also looking the breach, according to representatives for the attorneys general in those two states.

33.    On October 7, 2015, United States Senators Richard Blumenthal (D-Conn.), Ranking Member of the Senate Commerce Subcommittee on Consumer Protection, Bill Nelson (D-Fla.), Ranking Member of the Senate Commerce Committee, and Brian Schatz (D-Hawaii), Ranking Member of the Senate Commerce Subcommittee on Communications and the Internet, sent a letter to T-Mobile CEO Legere and Experian CEO Brian Cassin, demanding answers from T-Mobile and Experian on actions the companies are taking to address the recent security breach that exposed the personal data, including social security numbers, of up to 15 million T-Mobile customers.  The letter set forth, in relevant part:

> We write with regard to the recent reported data security breach at Experian, which may have exposed the names, address, birth dates and Social Security numbers of fifteen million T-Mobile customers.  This news is extremely troubling to us given the sensitive nature of the compromised personal data, and its particular value to identity thieves.
>
> Unlike bank account numbers, which can be deleted as soon as a bank identifies fraud, Social Security numbers are hard to change and are tied to tax forms, credit cards, mortgages, bank accounts, health insurance, and medical records. By learning someone's Social Security number, a criminal can obtain credit cards in a victim's name, wire money from a victim's bank account, or even access tax and medical records. According to the Department of

---

[6] *See* http://www.reuters.com/article/2015/10/02/us-experian-cyberattack-investigation-idUSKCN0RW2BC20151002 (last visited Oct. 11, 2015).

CLASS ACTION COMPLAINT

Justice, 64 percent of the 17.6 million victims of identity theft in 2014 experienced a direct financial loss resulting from personal information fraud. This is particularly distressing based on your companies' reported breach, because victims of personal information fraud lost an average of $7,761 compared to victims of bank or credit card fraud who lost an average of $780.

The Senate Committee on Commerce, Science, and Transportation has jurisdiction over commercial online practices and data security, and, as Ranking Members of the full Committee, the Subcommittee on Consumer Protection, Product Safety, Insurance and Data Security, and the Subcommittee on Communications, Technology, Innovation and the Internet, we have been advocates for data security and breach notification legislation that would better protect consumers and improve corporate responsibility. Experian and T-Mobile's recent incident demonstrates the need for legislation that addresses both consumer notification and sets minimum security requirements for companies that collect and store such sensitive consumer data.

We request that Experian's information-security executives provide a detailed accounting to the Committee regarding your investigations and latest findings on the circumstances that permitted unauthorized access to the personal information of so many Americans. We expect that your security experts have had enough time to thoroughly examine the cause and impact of the breach and will be able to provide the Committee with detailed information.

34. According to *Guardian News*, dozens of consumer privacy groups are calling for a U.S. Federal Trade Commission ("FTC") investigation into the data breach, saying that intrusions into other parts of Experian's data "would be a terrifying and unmitigated disaster." In a letter from the Public Interest Research Group (PIRG), co-signed by 25 different data security and consumer advocacy organizations, the groups publicly questioned Experian's assertion that its consumer

credit database of over 200 million people was safe from thieves.[7]

35.    Such questioning comes as details are emerging about what former Experian contractors characterize as a lax approach to security implementation at Experian, especially at companies it acquires. The data giant spends liberally on security, many say, but less so on implementation.  Data security researching Brian Krebs ("Krebs") interviewed several former Experian contractors who told him that high security standards were not a part of Experian's daily operations.  As contractor Jasun Tate ("Tate") told Krebs, "[w]hat the board of directors at Experian wanted security-wise and the security capabilities on the ground were two completely different things."  Experian had a mandate to grow by acquiring other businesses with proprietary data sets, but according Tate, to when it came to securing that data at Experian after an acquisition, "the subsequent integration of the business into our core security architecture was just a black box of magic in terms of how it was to be implemented.  And I'm not saying successful magic at all."

36.    Data stolen from those 15 million victims includes victims' names, addresses, and birthdates, as well as social security numbers, drivers' license ID numbers, and passport ID number.  As Krebs points out, this is not the first time this has happened to Experian.  It is at least the second time this exact thing has happened to the firm.  "This actually wasn't the first time that a hacking incident at Experian exposed sensitive T-Mobile customer data," Krebs wrote, "and that previous breach may hold important clues about what went wrong more recently."

37.    As PMYTS.com reported on October 10, 2015:[8]

> As 2013 was drifting into 2014 and the breach that was on everyone's mind was Target's, T-Mobile released the news that a "relatively small" number of customers had

---

[7] See http://www.theguardian.com/business/2015/oct/08/experian-hack-advocates-question-security-database (last visited Oct. 11, 2015).

[8] See http://www.pymnts.com/news/2015/what-went-wrong-at-experian-and-how-it-could-at-lots-of-other-places-too/ (last visited Oct. 11, 2015).

their personal data exposed when servers owned by Experian were breached." At the time, the culprit was identified as Decisioning Solutions, an identity-proofing and authentication company that Experian had recently acquired.

Decisioning Solutions became part of Experian's Decision Analytics platform, which is designed to offer credit and non-credit data, customer data and fraud detection to Experian's various clients—lenders, cable companies, mobile providers, debt collectors, utilities and various levels of government.

The culprit then was that the platform that issued support tickets did so in a wholly insecure fashion. And, if Krebs' inside sources are correct, this latest one as well.

"KrebsOnSecurity was contacted by an anonymous source who sent this author a Web link that, when clicked, opened up a support ticket within that Decision Analytics platform in the United Kingdom — with absolutely no authentication needed," Krebs wrote. "That support ticket I viewed appears to have been filed by someone in an office cube at Experian's data center in Costa Rica who was requesting hardware support for a component of the company's Global Technology Services division."

It seems that most, if not all, of the various support requests — requests filled with important information about employee names, addresses, network shares, IP addresses, LanIDs — were more or less wholly exposed to the open Internet with no authentication required at all.

"The support site also apparently allowed anyone to file support tickets, potentially making it easy for clever attackers who'd studied the exposed support tickets to fabricate a request for access to Experian resources or accounts on the system."

And, of course, various experts Krebs spoke to noted that the site also allowed anyone to upload any file attachment

16

of any file type — capabilities that attract cybercriminals like sugar water attracts flies.

All in, Krebs noted that the entirety of the panel of experts he interviewed noted the set-up was so insecure as to be "asking for trouble."

\* \* \*

And while Decisioning Solutions was bad insofar as it was the weak point behind not one but two breaches, they are not, in fact, the worst security-related acquisition Experian has made in recent years.

That crown goes to Court Ventures, Inc., a firm Experian grabbed in 2012 that specialized in the sale of aggregated and repackaged public record data from more than 1,400 state and county sources.

"This acquisition strengthens Experian's consumer data assets in North America and is a further step in Experian's strategy to extend its global lead in credit information and analytics," the company says on its website.

Or it might have, except that when the company acquired Court Ventures, it also acquired its client list, including "human Trojan horse" Hieu Minh Ngo. Ngo told Court he was a private detective — they didn't look into to it too closely — and thus never found out that he was actually a data broker who catered to identity thieves. He had about 1,000 customers when Experian bought Court Ventures.

Once Experian bought out Court Ventures, however, Ngo saw his business boom, since he suddenly had access to records on about 200 million Americans. That figure comes from documents filed by the U.S. prosecutors who successfully tried and jailed Ngo earlier this year.

Experian's answer to the U.S. Congress — who called them in to question just how exactly the acquisition vetting process failed to turn up the face of a professional black market data broker — was that it didn't have much in the

17

CLASS ACTION COMPLAINT

way of direct answers.

"There's been no allegation that any harm has come, thankfully, in this scam," said Tony Hadley, Experian's senior vice president of government affairs and public policy, testifying in front of the Senate Commerce Committee in Dec. 2013.

Experian is not exactly a new or naive player at the table in data security, nor was it a company that had a reputation for being particularly behind the times. In fact, according to employees and former employees Krebs spoke to, for a while, Experian was doing everything right. Then, one personnel change changed everything.

"All interviewed directly attributed that progress to the leadership of then-Chief Information Officer (CIO) John Finch, who helped hire and build up a staff of nearly 30 talented professionals to monitor Experian's security 'brain' — the 'security operations center,' or SOC for short."

The SOC had a big vision: It was meant to be a real-time defense against cyberattacks, as well as a tool to assess and fix vulnerabilities before they turned into breaches.  But Finch left Experian to be the CIO at the Bank of England, and with his departure, the department floundered. The best talent left, morale suffered and the team fell from 30 to about 12.

"I don't have any ill will toward the company, but what happened there was just a culmination of wrong decisions made outside of the security team's control," said one of Experian's former security employees.

And that is a shame, those employees said, because the team feels they almost accomplished something great.

"We had a period of time there where security was viewed in a positive light, and things weren't being swept under the rug for the sake of uptime," an employee said. "He left,

CLASS ACTION COMPLAINT

and it kind of went the opposite direction. Once the leadership changed, the focus changed to controlling costs and not taking systems down for maintenance, and investments started disappearing from a lot of areas. We were in the middle of putting into operation certain tools to do next-generation detection of [cyber] threats, but we weren't able to get many of them out into production. And that's how Experian wound up where they are now."

38.     Notwithstanding the flagrantly lax security measures leading to disclosure of highly private and sensitive personal and financial information belonging to Plaintiff and other class members, Experian claims "Privacy Policies" available to view (among other places) on its websites.  Experian's Privacy Policy sets forth that "Experian is held accountable for its information use by consumer privacy expectations and by laws and industry codes established by government entities and industry organizations around the world."[9]  It further states: "We use a variety of security systems to safeguard the information we maintain and provide. . . . . We comply with all laws and applicable self-regulatory guidelines. . . . We comply with all contractual restrictions placed on information provided to Experian."[10]

39.     As a direct and proximate result of Defendants' actions and omissions in disclosing and failing to protect Plaintiff's private personal information, Plaintiff and those similarly situated have been placed at a substantial risk of harm in the form of identity theft, and have incurred (and will incur) actual damages in an attempt to prevent identity theft.

## **CLASS ALLEGATIONS**

40.     Plaintiff brings this complaint on behalf of himself and the following class:

---

[9] *See* http://www.experian.com/privacy/accountability.html (last visited Oct. 11, 2015).

[10] *See* http://www.experian.com/privacy/information_values.html (last visited Oct. 11, 2015).

CLASS ACTION COMPLAINT

All natural persons and entities in the United States whose personal identifying information was disclosed in the data breach announced by Experian on October 1 and 8, 2015, which disclosed records related to certain organizations, certain Experian customers and consumer applications requiring a credit check or financing between September 1, 2013 and September 16, 2015.

41.   The members of the putative class, estimated at 15 million, are so numerous that joinder of individual claims is impracticable. Members of the class can be readily identified through Experian's and T-Mobile's records.

42.   There are significant questions of fact and law common to the members of the class. These issues include:

> a. Whether Experian failed to establish appropriate administrative, technical and physical safeguards to ensure the security and confidentiality of records to protect against known and anticipated threats to security;
>
> b. Whether the security provided by Experian was satisfactory to protect customer information as compared to industry standards;
>
> c. Whether Experian misrepresented or failed to provide adequate information to customers regarding the type of security practices used;
>
> d. Whether Experian's conduct was intentional, willful or negligent;
>
> e. Whether Experian violated any and all statutes and/or common law listed herein;
>
> f. Whether the putative class suffered damages as a result of Experian's conduct or omissions; and
>
> g. Whether class members are entitled to injunctive, declarative and monetary relief as a result of

20

CLASS ACTION COMPLAINT

Experian's conduct.

43. Plaintiff's claims are typical of the claims of the putative class. Plaintiff and all members of the putative class have been adversely affected and damaged in that Experian failed to adequately protect their private information to the detriment of Plaintiff and the putative class.

44. The proposed class representative will fairly and adequately represent the putative class because he has the class members' interest in mind, his individual claims are co-extensive with those of the class, and because he is represented by qualified counsel experienced in class action litigation of this nature.

45. A class action in this instance is superior to other available methods for the fair and efficient adjudication of these claims because individual joinder of the claims of all members of the putative class is impracticable. Many members of the class are without the financial resources necessary to pursue this matter. Even if some members of the class could afford to litigate their claims separately, such a result would be unduly burdensome to the courts in which the individualized cases would proceed. Individual litigation increases the time and expense of resolving a common dispute concerning Experian's actions toward an entire group of individuals. Class action procedures allow for far fewer management difficulties in matters of this type and provide the unique benefits of unitary adjudication, economies of scale and comprehensive supervision over the entire controversy by a single judge in a single court.

46. The putative class may be certified pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure because Experian has acted on grounds generally applicable to the putative class, thereby making final injunctive relief and corresponding declaratory relief appropriate with respect to the claims raised by the class.

47. The putative class may be certified pursuant to Rule 23(b)(3) of the

21

Federal Rules of Civil Procedure because questions of law and fact common to class members will predominate over questions affecting individual members, and a class action is superior to other methods for fairly and efficiently adjudicating the controversy and causes of action described in this Complaint.

## COUNT I
## AGAINST DEFENDANTS FOR NEGLIGENCE

48.  Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

49.  Defendants owed a duty to Plaintiff and all class members to utilize security measures and practices that would protect the PII provided to Experian against a cyber-attack.  Such an attack was the exact scenario that played out here, as set forth above.  Defendants breached this duty when Experian utterly failed to use security practices that would protect the PII provided to it by Plaintiff and other class members.

50.  As a direct and proximate result of Defendants' failure to use sufficient security practices, Experian's system was hacked.  This caused Plaintiff's and all class members' PII to be disseminated to unauthorized individuals,  which in turn caused direct and substantial damages to Plaintiff and class members.   In addition, there exists the distinct possibility of future harm to Plaintiff and class members through the dissemination of their PII, as well as the possibility of identity theft.

51.  By engaging in the forgoing acts and omissions, Defendants committed the common law tort of negligence.

## COUNT II
## AGAINST DEFENDANTS FOR WILLFUL VIOLATION OF THE FAIR CREDIT REPORTING ACT (15 U.S.C. § 1681, et seq.)

52.  Plaintiff incorporates by reference and realleges each and every allegation set forth in paragraphs 1 through 47 above, as though fully set forth herein.

53.  Pursuant to 15 U.S.C. § 1681a(f), a "consumer reporting agency"

22

CLASS ACTION COMPLAINT

includes any person which, for monetary fees or on a cooperative nonprofit basis, regularly engages, in whole or in part, in the practice of assembling or evaluating consumer credit information or other consumer information for the purpose of furnishing "consumer reports" to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports.

54.     Pursuant to 15 U.S.C. § 1681a(d)(1), a "consumer report" is any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living, which is used, expected to be used, or collected, in whole or in part, for the purpose of serving as a factor in establishing the consumer's eligibility for (i) credit or insurance to be used primarily for personal, family, or household purposes, (ii) employment purposes, or (iii) any other purpose authorized by 15 U.S.C. § 1681b.

55.     "Consumer credit information" includes, *inter alia*, a person's name, identification number (that is, Social Security number), physical address and contact information, financial accounts and financial account history (i.e., details of the management of the accounts), marital status, educational background, employment, professional or business history, credit report inquiries (i.e., whenever consumer credit information is requested from a credit reporting agency), judgments, administration orders, defaults, and other notices.

56.     The Fair Credit Reporting Act (the "FCRA") limits the dissemination of "consumer credit information" to certain well-defined circumstances and no other. 15 U.S.C. § 1681b(a).

57.     At all relevant times, the Defendants were (and continue to be) a consumer reporting agency under FCRA because on a cooperative nonprofit basis and for monetary fees, the Defendants regularly (i) received, assembled and/or evaluated Plaintiff's and class members' "consumer credit information" protected by

23

CLASS ACTION COMPLAINT

FCRA for the purpose of furnishing consumer reports to third parties; and (ii) used the means and facilities of interstate commerce to prepare, furnish and transmit consumer reports containing Plaintiff's and class members' consumer credit information to third parties (and continues to do so).

58.    As a consumer reporting agency, the Defendants were (and continue to be) required to identify, implement, maintain and monitor the proper data security measures, policies, procedures, protocols, and software and hardware systems to safeguard, protect and limit the dissemination of consumer credit information in its possession, custody and control, including Plaintiff's and class members' consumer credit information, only for permissible purposes under FCRA. See 15 U.S.C. § 1681(b).

59.    By the wrongful actions set forth herein, inaction and omissions, want of ordinary care, and the resulting security breach, the Defendants willfully and recklessly violated 15 U.S.C. § 1681(b), 15 U.S.C. § 1681a(d)(3), 15 U.S.C. § 1681b(a);(g), and 15 U.S.C. § 1681c(a)(6) (and the related applicable regulations) by failing to identify, implement, maintain and monitor the proper data security measures, policies, procedures, protocols, and software and hardware systems to safeguard and protect Plaintiff's and class members' consumer credit information.

60.    The Defendants' above-described wrongful actions, inaction and omissions, and want of ordinary care, in turn, directly and proximately caused the security breach which, in turn, directly and proximately resulted in the wrongful dissemination of Plaintiff's and class members' consumer credit information into the public domain for no permissible purpose under FCRA. The Defendants' above described willful and reckless FCRA violations have prevented Experian from timely and immediately notifying Plaintiff and class members about the security breach which has caused additional economic damages and other actual injury and harm on Plaintiff and class members.

CLASS ACTION COMPLAINT

61.    The Defendants' wrongful actions (set forth herein), inaction, omissions, and want of ordinary care, and the resulting security breach, directly and proximately caused Plaintiff and class members to suffer economic damages and other actual injury and harm, and collectively constitute the willful and reckless violation of FCRA.  Had the Defendants not engaged in such wrongful actions, inaction, omissions, and want of ordinary care, Plaintiff's and class members' consumer credit information would not have been disseminated for no permissible purpose under FCRA and used to commit identity fraud.  Plaintiff and class members, therefore, are entitled to declaratory relief (as set forth below), injunctive relief (as set forth below), and compensation for their economic damages, and other actual injury and harm in the form of, *inter alia*, (i) the lost intrinsic value of their privacy; (ii) deprivation of the value of their consumer credit information, for which there is a well-established national and international market; (iii) the financial and temporal cost of monitoring their credit, monitoring their financial accounts, and mitigating their damages; and (iv) statutory damages of not less than $100, and not more than $1,000, each, under 15 U.S.C. § 1681n(a)(1).

62.    Plaintiff and class members also are entitled to recover punitive damages, under 15 U.S.C. § 1681n(a)(2), and their attorneys' fees, litigation expenses, and costs, under 15 U.S.C. § 1681n(a)(3).

/ / /

/ / /

## COUNT III
## AGAINST DEFENDANTS FOR NEGLIGENT VIOLATION OF THE FAIR CREDIT REPORTING ACT (15 U.S.C. § 1681, ET SEQ.)

63.    Plaintiff incorporates by reference and realleges each and every allegation contained in paragraphs 1 through 47 above above, as though fully set forth herein.

64.    In the alternative, by their above-described wrongful actions, inaction

25

and omissions, want of ordinary care, and the resulting security breach, the Defendants negligently or in a grossly negligent manner violated 15 U.S.C. § 1681(b), 15 U.S.C. § 1681a(d)(3), 15 U.S.C. § 1681b(a);(g), and 15 U.S.C. § 1681c(a)(6) (and the related applicable regulations) by failing to identify, implement, maintain and monitor the proper data security measures, policies, procedures, protocols, and software and hardware systems to safeguard and protect Plaintiff's and class members' consumer credit information.

65.   The Defendants' above-described wrongful actions, inaction and omissions, and want of ordinary care, in turn, directly and/or proximately caused the security breach which, in turn, directly and proximately resulted in the wrongful dissemination of Plaintiff's and class members' consumer credit information into the public domain for no permissible purpose under FCRA.  The Defendants' above-described willful and reckless FCRA violations also have prevented Experian from timely and immediately notifying Plaintiff and class members about the security breach.  This has inflicted additional economic damages and other actual injury and harm on Plaintiff and class members.

66.   It was reasonably foreseeable to the Defendants that the failure to identify, implement, monitor and maintain the proper data security measures, policies, procedures, protocols, and software and hardware systems to safeguard and protect Plaintiff's and class members' consumer credit information would result in a security lapse and/or breach, whereby unauthorized third parties (i.e., hackers) would gain access to and have the ability to disseminate Plaintiff's and class members' consumer credit information into the public domain for no permissible purpose under FCRA.  The Defendants' above-described wrongful actions, inaction, omissions, and want of ordinary care, and the resulting security breach, directly and proximately caused Plaintiff and class members to suffer economic damages and other actual injury and harm, and collectively constitute the negligent violation of FCRA.  Had

the Defendants not engaged in such wrongful actions, inaction, omissions, and want of ordinary care, Plaintiff's and class members' consumer credit information would not have been disseminated to for no permissible purpose under FCRA, and such information would not have been used to commit identity fraud.  Plaintiff and class members, therefore, are entitled to declaratory relief (as set forth below), injunctive relief (as set forth below), and compensation for their economic damages, and other actual injury and harm in the form of, inter alia, (i) the lost intrinsic value of their privacy; (ii) deprivation of the value of their consumer credit information, for which there is a well-established national and international market; and (iii) the financial and temporal cost of monitoring their credit, monitoring their financial accounts, and mitigating their damages.

67.    Plaintiff and class members also are entitled to recover their attorneys' fees, litigation expenses, and costs, under 15 U.S.C. § 1681o(a)(2).

## COUNT IV
## AGAINST DEFENDANTS FOR DECLARATORY RELIEF

68.    Plaintiff incorporates by reference and realleges each and every allegation set forth in paragraphs 1 through 47 above, as though fully set forth herein.

69.    Pursuant to the Declaratory Judgment Act, Plaintiff and class members respectfully request that this Court enter a judgment declaring, *inter alia*, (i) that the Defendants owed (and continue to owe) a legal duty to safeguard and protect Plaintiff's and class members' confidential and sensitive consumer credit information, and to timely notify them about any security breach; (ii) that the Defendants breached (and continue to breach) such legal duties by failing to safeguard and protect Plaintiff's and class members' confidential and sensitive payment consumer credit information; and (iii) that the Defendants' breach of their legal duties directly and proximately caused the security breach, and the resulting damages, injury, and harm suffered by Plaintiff and class members.

CLASS ACTION COMPLAINT

## COUNT V
## AGAINST DEFENDANTS FOR INJUCTIVE RELIEF

70.    Plaintiff incorporates by reference and realleges each and every allegation set forth in paragraphs 1 through 47 above, as though fully set forth herein.

71.    Defendants' above-described wrongful actions, inaction, omissions, want of ordinary care, nondisclosures, and the resulting security breach have caused (and will continues to cause) Plaintiff and class members to suffer irreparable harm in the form of, *inter alia*, economic damages and other injury and actual harm in the form of, *inter alia*, (i) actual identity theft and identity fraud; (ii) invasion of privacy; (iii) loss of the intrinsic value of their privacy; (iv) breach of the confidentiality of their consumer reports and consumer credit information; (v) deprivation of the value of their consumer credit information, for which there is a well-established national and international market; (vi) the financial and temporal cost of monitoring their credit, monitoring their financial accounts, and mitigating their damages; and (vii) the imminent, immediate, and continuing increased risk of ongoing identity theft and identity fraud. Such irreparable harm will not cease unless and until enjoined by this Court.

72.    As a result, Plaintiff and class members are entitled to injunctive relief and other   appropriate affirmative relief including an order compelling the Defendants to, *inter alia*, (i) notify each person whose consumer credit information was exposed in the security breach; (ii) provide credit monitoring to each such person for at least six years; (iii) establish a fund (in an amount to be determined) to which such persons may apply for reimbursement of the time and out-of-pocket expenses they incurred to remediate identity theft and/or identity fraud (i.e., data breach insurance), from September 16, 2015, forward to the date the above-referenced credit monitoring terminates; and (iv) discontinue the above-described wrongful actions, inaction, omissions, want of ordinary care, nondisclosures, and the resulting security breach.

73.    Plaintiff and class members also are entitled to injunctive relief requiring the Defendants to implement and maintain data security measures, policies, procedures, controls, protocols, and software and hardware systems, including, *inter alia*, (i) engaging third-party security auditors/penetration testers and internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on the Defendants' computer systems on a periodic basis; (ii) engaging third-party security auditors and internal personnel to run automated security monitoring; (iii) auditing, testing, and training its security personnel regarding any new or modified procedures; (iv) conducting regular database scanning and security checks; (v) regularly evaluating web applications for vulnerabilities to prevent web application threats; and (vi) periodically conducting internal training and education to inform internal data security personnel how to identify and contain data security lapses.

74.    In the absence of an injunction, Plaintiff and class members will suffer irreparable injury in the event the Defendants have another security lapse and/or have their systems breached by hackers.  Such a risk is real, immediate, and substantial.

75.    The hardship to Plaintiff and class members if an injunction is not issued exceeds the hardship to the Defendants if an injunction is issued. Among other things, if the Defendants are the subject of another security lapse and/or breach, Plaintiff and class members will likely again incur millions of dollars in damages.  On the other hand (and notwithstanding the fact that the Defendants have a pre-existing legal obligation to employ adequate customer data security measures), the cost to the Defendants to comply with the above-described injunction they are already required to implement is relatively minimal.

76.    An issuance of the requested injunction will not disserve the public interest.  In fact, such an injunction would benefit the public by preventing another security lapse and/or breach, thereby eliminating the damages, injury, and harm that

CLASS ACTION COMPLAINT

would be suffered by Plaintiff, class members, and the millions of individuals whose PII and sensitive consumer credit information would be compromised.

**COUNT VI**
**AGAINST DEFENDANTS FOR INVASION OF PRIVACY**

77.     Plaintiff incorporates by reference and realleges each and every allegation set forth in paragraphs 1 through 47 above, as though fully set forth herein.

78.     The Defendants invaded Plaintiff's and the Class members' right to privacy by allowing the unauthorized access to Plaintiff's and Class members' PII, and by negligently maintaining the confidentiality of Plaintiff's and Class members' PII, as set forth herein.

79.     The intrusion described herein was offensive and objectionable to Plaintiff and the Class members, as it would be to a reasonable person of ordinary sensibilities in that Plaintiff's and Class members' PII was disclosed without prior written authorization of Plaintiff and the Class.

80.     The intrusion was into a place or thing which was private and is entitled to be private, in that Plaintiff and the Class members privately provided and disclosed their PII to Experian (as customers of T-Mobile), with an intention that the PII would be kept confidential and would be protected from unauthorized disclosure.  Plaintiff and the Class members were reasonable to believe that such information would be kept private and would not be disclosed without their written authorization.

81.     As a proximate result of Defendants' above acts, Plaintiff's and the Class members' confidential information was viewed, distributed, printed and used by persons without prior written authorization.  As a result, Plaintiff and the Class members suffered damages.

82.     Defendants are guilty of oppression, fraud, or malice by permitting the unauthorized disclosure of Plaintiff's and the Class members' personal information with a willful and conscious disregard of Plaintiff's and the Class members' right to

30

CLASS ACTION COMPLAINT

privacy.

83.    Unless and until enjoined and restrained by order of this Court, Defendants' wrongful conduct will continue to cause Plaintiff and the Class members great and irreparable injury in that the confidential maintained by Defendants can be viewed, distributed, printed, and used by unauthorized persons. Plaintiff and Class members have no adequate remedy at law for the injuries in that a judgment for the monetary damages will not end the invasion of privacy for Plaintiff and the Class.

**COUNT VII**
**AGAINST DEFENDANTS FOR**
**VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAWS**
**BUS. & PROF. CODE, § 17200**

84.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

85.    Plaintiff brings this cause of action on behalf of Plaintiff and the Class members whose personal information was compromised as a result of the data breach.

86.    Defendants' acts and practices, as alleged in this complaint, constitute unlawful and unfair business practices in violation of the Unfair Competition Law (the "UCL"), Bus. & Prof. Code, § 17200, et seq.

87.    Defendants' acts and practices, as alleged herein, constitute unlawful and unfair practices in that they violate Civil Code section 1798.80, et seq., and because Defendants' conduct was negligent.

88.    Defendants' practices were unlawful and in violation of Civil Code section 1798.81.5(b) because Defendants failed to undertake reasonable security measures in protecting their former, current, and prospective customers' PII.

89.    Defendants' practices were also unlawful and in violation of Civil Code section 1798.82 because Defendants unreasonably delayed informing Plaintiff and members of the Class about the breach of security after Defendants knew that the

data breach occurred.

90.    The acts, omissions, and conduct of Defendants constitute a violation of the unlawful prong of the UCL because they failed to comport with a reasonable standard of care and public policy as reflected in statutes such as the Information Practices Act of 1977, Civ. Code, § 1798, et seq., and the California Customer Records Act, Civ. Code, § 1798.80, et seq., which seeks to protect individuals' data and ensure that entities that solicit or are entrusted with personal data utilize reasonable security measures.

91.    Defendants violated the "unfair" prong of the UCL because their acts and/or omissions were immoral, unethical, oppressive, unscrupulous, unconscionable, and/or substantially injurious to Plaintiff and Class members. Defendants' conduct also undermines California public policy as reflected in other statutes such as the Information Practices Act of 1977, Civ. Code, § 1798, et seq., which seeks to protect individuals' data and ensure that entities who solicit or are entrusted with personal data utilize reasonable security measures.

92.    As a direct and proximate result of Defendants' unlawful and unfair business practices as alleged herein, Plaintiff and members of the Class have suffered the following injuries in fact and losses of money or property: (1) loss of opportunity to control how their PII is used; (2) diminution in the value and/or use of their PII; (3) the compromise, publication, and/or theft of their PII; (4) out-of-pocket costs associated with the prevention, detection, and recovery from identity theft or unauthorized use of financial and medical costs; (5) lost opportunity costs and loss of productivity from efforts to mitigate the actual and future consequences of the theft of PII; (6) cost associated with the inability to use credit and assets frozen or flagged as a result of credit misuse; (7) unauthorized use of compromised PII; (8) tax fraud or other unauthorized charges to financial, health care, or medical accounts; (9) continued risk regarding PII that remain in the possession of Defendants, as long as

Defendants fail to undertake adequate measures to protect PII; and (10) future costs in terms of time, effort, and money that will be expended to prevent and repair the impact of the data breach.

93.     As a direct and proximate result of Defendants' unlawful and unfair business practices as alleged herein, Plaintiff and the Class members face an increased risk of identity theft based on the theft and disclosure of their personal information.

94.     Because of Defendants' unfair and unlawful and unfair business practices, Plaintiff and the Class are entitled to relief, including: (1) restitution to Plaintiff and Class members of the losses they incurred as a result of the data breach and restitutionary disgorgement of all profits accruing to Defendants as a result of their unlawful and unfair business practices; (2) attorneys' fees and costs; (3) declaratory relief; and (4) a permanent injunction enjoining Defendants from their unlawful and unfair practices.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff for himself and class members, respectfully requests that: (i) this action be certified as a class action; (ii) Plaintiff be designated the Class Representative; and (iii) Plaintiff's counsel be appointed as Class Counsel.  Plaintiff, for himself and class members, further requests that upon final trial or hearing, judgment be awarded against Defendant, in Plaintiff's favor for:

(i)      statutory and actual damages under the FCRA in an amount to be determined by the trier of fact;

(ii)     punitive damages in an amount to be determined by the trier of fact;

(iii)    declaratory and injunctive relief (as set forth above);

(iv)    attorneys' fees, litigation expenses and costs of suit incurred through the trial and any appeals of this case; and

(v)     such other and further relief the Court deems just and proper.

CLASS ACTION COMPLAINT

1

## **JURY DEMAND**

2          Plaintiff, individually and on behalf of class members, respectfully demands

3   a trial by jury on all of his claims and causes of action so triable.

4

5   Dated: October 20, 2015                     Respectfully submitted,

6                                                        //Gabriel S. Barenfeld
                                                **NELSON & FRAENKEL LLP**
7                                               Stuart R. Fraenkel (173991)
                                                Gabriel S. Barenfeld (224146)
8                                               707 Wilshire Blvd., Suite 3600
                                                Los Angeles, CA  90017
9                                               Telephone:  (213) 622-6469
                                                Fax:  (213) 622-6019
10                                              stuart@nflawfirm.com
                                                gbarenfeld@nflawfirm.com
11

12                                              **KEHOE LAW FIRM P.C.**
13                                              John A. Kehoe (*pro hac vice to be filed*)
                                                2 Penn Center, Suite 1020
14                                              Philadelphia, PA 19102
                                                Telephone:  (215) 792-6676
15                                              Facsimile:   (212) 500-1329
                                                jkehoe@kehoelawfirm.com
16

17

18                                              **PROFY PROMISLOFF**
                                                  **&  CIARLANTO, P.C.**
19                                              Joseph M. Profy
20                                              David M. Promisloff
                                                Jeffrey J. Ciarlanto
21                                              100 N 22nd Street, Unit 105
22                                              Philadelphia, PA 19103
                                                Telephone:  (215) 259-5156
23                                              Facsimile:   (215) 600-2642

24                                              *Attorneys for Plaintiff*

25

26

27
                                                      34
28                                      CLASS ACTION COMPLAINT